**Doris SIMMONS–HARRIS, et al., Plaintiffs,**

v.

**Dr. Susan Tave ZELMAN, Superintendent of Public Instruction, State of Ohio, Defendant.**

**Sue Gatton, et al., Plaintiffs,**

v.

**Dr. Susan Tave Zelman, Superintendent of Public Instruction, State of Ohio, et al., Defendants.**

**Nos. 1:99 CV 1740, 1:99 CV 1818.**

United States District Court, N.D. Ohio, Eastern Division.

Dec. 20, 1999.

David G. Latanick, Cloppert, Portman, Sauter, Latanick & Foley, Columbus, OH, Raymond V. Vasvari, American Civil Liberties Union, Cleveland, OH, Ayesha N. Khan, Americans United for the Separation of Church and State, Washington, DC, Steven R. Shapiro, American Civil Liberties Union Foundation, New York, NY, Elliot M. Mincberg, Judith Schaeffer, People for the American Way, Washington, DC, Christopher A. Lopez, The Ohio Education Association, Columbus, OH, Steven K. Green, Washington, DC, Andrew D. Roth, Robert H. Chanin, Alice O'Brien, Bredhoff & Kaiser, Washington, DC, for Doris Simmons-Harris, Marla Franklin, Steven Behr.

Roger F. Carroll, Mary Lynn Ready, Matthew D. Miko, Karen Lee Lazorishak, Susan C. Walker, Edward B. Foley, State Solicitor, Charles W. See, Office of the Atty. Gen., Columbus, OH, for Susan Tave Zelman.

David C. Tryon, Porter, Wright, Morris & Arthur, Cleveland, OH, Clint Bolick, Richard Komer, Matthew Berry, Institute for Justice, Washington DC, for Senel Taylor, intervenor–defendant, Johnietta McGrady, Christine Suma, Arkela in her own behalf and as natural guardian of her children, Tanashia Winston, and Devonte Winston, Amy in her own behalf and as natural guardian of her child Amber Lee Angelo.

James D. Thomas, Squire, Sanders & Dempsey, Cleveland, OH, David J. Young, Michael R. Reed, Squire, Sanders & Dempsey, Columbus, OH, David J. Hessler, Nathan E. Hessler, Wegman, Hessler, Vanderburg & O'Toole, Beacon Place, Cleveland, OH, for Hanna Perkins School.

## ORDER

OLIVER, District Judge.

## I. INTRODUCTION AND FACTS

Plaintiffs brought this action seeking to enjoin permanently a portion of the Ohio Pilot Scholarship Program on the ground

that it violates the Establishment Clause of the First Amendment to the United States Constitution made applicable to the States by the Fourteenth Amendment to the U.S. Constitution. All plaintiffs and all defendants in these consolidated actions have filed motions for summary judgment except for Intervenor/Defendant Hanna Perkins, who filed a brief in support of the other Defendants' motions for summary judgment. For the reasons set forth below, the court grants the Motions for Summary Judgment of Plaintiffs Doris Simmons–Harris, et al. and Plaintiffs Sue Gatton, et al. (Doc. Nos. 83 and 97, respectively), and denies the Motions for Summary Judgment of Intervening Defendants Senel Taylor, et al. and the State Defendants, et al. (Doc. Nos. 82 and 92, respectively). Accordingly, the State Defendants are permanently enjoined from administering the Voucher Program.

In 1995 the Ohio Legislature enacted a pilot scholarship program to address an educational crisis in Cleveland's public schools in the wake of a U.S. District Court-ordered takeover of the administration of the Cleveland City School District (the "District") by the State. This program, as more fully discussed herein, was struck down by the Ohio Supreme Court as being in violation of the Ohio Constitution. The program was re-enacted in all pertinent respects by the Ohio Legislature in June 1999. The 1999 program is applicable, as was the 1995 program, to students residing in the District. The program has two components: a scholarship program to enable students to attend "alternative schools" ("Voucher Program" or "Program"); and a tutorial program for children attending the Cleveland Public Schools ("Tutorial Program"). Plaintiffs, while challenging the constitutionality of the Voucher Program, do not challenge the Tutorial Program in this action.[1]

Private schools within the geographic boundaries of the District and public schools adjacent to the District are eligible to participate in the Voucher Program as "alternative schools." In order to do so, private schools must register with the State Superintendent. Recipients are chosen by lot and receive a fixed percentage of the tuition charged by the alternative school of their choice, up to $2,500. Students whose family income is not more than 200% of the federally-established poverty level receive 90% of their school tuition; other scholarship recipients whose family income is above this threshold receive 75% of their tuition. Participating students may first enroll in the Program as early as when they enter kindergarten and must do so by third grade. Once admitted to the Program, they are eligible for scholarships through eighth grade. Disbursement of scholarship money to a private school is accomplished by the State sending a check to the chosen school made payable to the parents of the recipient; thereafter, the parents must endorse the check to the school. The State places no restriction on how the private school may utilize the money. In the event that an adjacent public school is involved, the State would issue a check made payable to the school district.

In the three years prior to the Ohio Supreme Court's holding the 1995 program unconstitutional, no public schools registered for the program. None have registered since the enactment of the Program in 1999. For the 1999–2000 school year, 3,761 students were to be enrolled in the Program. Sixty percent of these students are from families at or below the poverty level. At the beginning of the 1999–2000 school year, fifty-six schools were registered to participate in the Program. Forty-six of the schools, or over

**1.** Tutorial grants may be used to obtain tutorial services for students enrolled in the Cleveland Public Schools. The same number of scholarships and tutorial grants must be awarded in a given year. The eligibility criteria for tutorial grants are the same as those for the scholarship grants, discussed below. The maximum allowable tutorial grant is $500.

82%, are church-affiliated.[2] Of the 3,761 students enrolled in the Program, 3,632, or over 96%, are enrolled in sectarian schools. Pl. J.A. vol. I, Ex. E.

Religious characteristics vary from school to school, but participating schools share certain traits. For example, it can generally be said that a central part of each school's program is instruction in the theology or doctrine of a particular faith and that religion and religious doctrines are an integral part of the entire school experience. A review of several schools' parent handbooks perhaps provides better insight into the religious nature of the schools at issue.[3]

For example, Saint Patrick School includes in its Family Handbook the following:

## PHILOSOPHY OF CATHOLIC EDUCATION

We believe that a philosophy of Catholic education begins with faith that God, in creating, gifted us with life. He became one of us in His Son Jesus, and in the person of His Spirit awaits our response to His unconditional overture of love. Jesus remains with the community He formed, witnessing and sharing the Good News in every age and with all people, ever yearning for a return of love either by a sincere response to conscience or by membership in His Church. It is from this perspective that the educational ministry of the Catholic community flows.

\* \* \* \* \* \*

2. The number of participating schools and number of participating religious schools were reached by Plaintiffs as a result of obtaining discovery from the State and the Hanna Perkins Intervenors/Defendants. O'Brien Aff. at ¶ 6, Pl. J.A. vol. I. Defendants do not dispute Plaintiffs' figures.

3. The parties have stipulated that the handbooks and mission statements produced by the schools participating in the Voucher Program "are authentic, speak for themselves,

## MISSION STATEMENT

St. Patrick School is a Catholic School in the Diocese of Cleveland, Ohio. The mission of St. Patrick School is to live and teach the Gospel message. We are dedicated to the formation of youth according to our Catholic Traditions within an innovative academic environment which provides students with the opportunity to develop spiritually, academically, and socially to the best of their abilities.

### Objectives of Education

1. To communicate the gospel message of Jesus.

2. To provide opportunities to build and experience a faith community.

3. To orient students to the responsibility and experience of service because of their membership in the Christian community.

4. To provide students with opportunity for growth in prayer.

5. To provide instruction in religious truths and values in such a way that they become an integrated part of the school program.

6. To develop a faculty and staff who by their presence and teaching express an integrated approach to learning and living in their lives.

7. To provide an academic program and environment conducive to the optimal development of each student.

St. Patrick Handbook at 1, Pl. J.A. vol. III, Ex. I, Tab 26.[4] Additionally, all students are required to participate in religion classes, which are taught daily, and to

have been made available to the parents of the scholarship students and are not false or misleading." Stipulation by the parties of October 15, 1999, at 2.

4. These are the "goals for Catholic schools in the Diocese of Cleveland." Pl. J.A. vol. IV, Ex. J, Tab 2 at v. Thirty-four of the forty-six participating religious schools are affiliated with the Diocese. Pl. J.A. vol. I, Ex. B, Tab 3.

attend all religious, liturgical, and para-liturgical celebrations. *Id.* at 10.

At St. Rocco School, "[a]n integral part of the school program is instruction in religious truths and values. These values permeates [*sic*] the whole atmosphere of the school." St. Rocco School Handbook at 3, Pl. J.A. vol. III, Ex. I, Tab 27. Each student at St. Rocco School is expected to contribute a nominal amount for membership in the Society for the Propagation of the Faith. *Id.* at 11. Like St. Patrick School, "[a]ll students, whether Catholic or not, participates [*sic*] in religion classes, mass, religious activities, and receive a religion grade." *Id.* at 11. Parents are asked to help their children practice specific prayers at each grade level. For example, they are to teach their children the Sign of the Cross and the Hail Mary in kindergarten and the Our Father and Glory Be to the Father in first grade. *Id.*

St. Stanislaus School "is an integral part of the St. Stanislaus community whose shared mission with parents is to facilitate Christian values within the context of the core curriculum. [They] commit [them-]selves to the formation of a faith-filled Catholic community, preparing students for spiritual development, and future roles as responsible, knowledgeable, productive Christian individuals." St. Stanislaus School Materials, Pl. J.A. vol. III, Ex. I, Tab 28. As one of its goals, "St. Stanislaus School will increase their Catholic Identity by developing opportunities for faith development of faculty and students." *Id.* As at St. Patrick and St. Rocco Schools, religion classes are taught daily at all grade levels and "[n]on-Catholic students attending [the school] are expected to be a part of the religion program and activities throughout the year." *Id.* Likewise, students and their families "are expected and obligated to attend and participate in the week-end liturgy." *Id.*

The philosophy of education at St. John Nottingham Lutheran School is:

It is our belief that the one cardinal objective of education to which all others point is to develop devotion to God as our Creator, Redeemer, and Sanctifier, whose love for us moves us to show in our every act, thought, word and desire, our love for Him.

"The Fear of the Lord is the Beginning of Knowledge." Proverbs 1:7.

St. John Nottingham Handbook at 2, Pl. J.A. vol. III Ex. I, Tab 34. Religion is taught at St. John Nottingham Lutheran through weekly worship chapel services, Bible studies, catechism, church history, confirmation instruction and memory. Additionally, the school teaches reading, mathematics, spelling, language, social studies, science and handwriting "*with a Christ-centered approach.*" *Id.* at 14 (emphasis in original).

At St. Mark Lutheran School:

The primary focus ... is on our Lord and Savior, Jesus Christ. In all of our goals, Jesus Christ must be preeminent. Because of our commitment to that focus and to our beliefs and philosophy, it is highly inconsistent for any parents to send a child to this school if they:

● Are not a Christian and/or are not interested in learning about Jesus Christ

● Are not living a Christian life or willing to learn how to lead such a life

● Are not a supporting part of a Christian congregation through worship and sharing of time and talents

St. Mark Handbook at 2, Pl. J.A. vol. III, Ex. I, Tab 35. All students at St. Mark are required to participate in daily religion classes and to "be instructed in the basic teachings of God's Word through an organized program of Christian education." *Id.* at 28. Each day begins with a classroom devotion and prayer and the school day is ended with classroom prayer. *Id.* Children also attend weekly chapel services.[5] *Id.*

---

**5.** By reciting only those portions of parent handbooks relating to religion, the court does

## II. PROCEDURAL HISTORY

Case No. 1:99 CV 1740 was filed on July 20, 1999, by Plaintiffs Doris Simmons–Harris, the parent of a minor child enrolled in the Cleveland City School District for the 1999–2000 school year; Marla Franklin, a teacher in the Lorain City School District; and Steven Behr, pastor of Our Savior/Nuestro Salvador Church in Lorain, Ohio, against Defendant Dr. Susan Tave Zelman, in her official capacity as Superintendent of Public Instruction for the Ohio Department of Education.

Case No: 1:99 CV 1818 was filed on July 29, 1999, by Plaintiffs Sue Gatton, chairperson of Citizens Against Vouchers; Mary Murphy, a teacher in the Cleveland City School District; Michael Debose, a pastor in Cuyahoga County, Ohio; Cheryl Debose and Glenn Altschuld, Ohio taxpayers; and Deidra Pearson, the parent of a child enrolled in the Cleveland City School District against Defendants Dr. Susan Tave Zelman, in her official capacity as Superintendent of Public Instruction for the Ohio Department of Education; the State of Ohio, through its General Assembly, Governor and other agents; and Sandra Berry, in her official capacity as Program Administrator for the Ohio Pilot Scholarship Program.

Two groups have intervened as defendants in both cases. The first group consists of parents of students who have been enrolled, or seek to enroll, in private schools under the Program. That group includes Senel Taylor, parent of a ten-year old child who has attended private school under the Program for the last two years; Johnnietta McGrady, parent of two children who seek to attend a private school under the Program; Christine Suma, parent of three children who have attended private school under the Program and one child who, at the time this action was filed, was on a waiting list to attend private school under the Program; Arkela Winston, parent of two children who have attended private school under the Program; and Amy Hudock, parent of a child who has attended private school under the Program for the past three school years.

The second group of intervenors includes nonpublic schools and parents of students who wish to participate in the Program. That group includes Hanna Perkins School, Our Lady of Peace School, Westpark Lutheran School, Lutheran Memorial Association of Cleveland, Ivy Chambers, Carol Lambert, and Delories Jones.

As is the case in the instant matter, Doris Simmons–Harris and Sue Gatton were the lead plaintiffs in the state court litigation challenging the 1995 program. The Plaintiffs challenged the 1995 program as a violation of the Establishment Clause of the First Amendment, and under several provisions of the Ohio Constitution.

The state trial court consolidated the two cases before it. On cross-motions for summary judgment, the court concluded that the 1995 program violated neither the United States Constitution nor the Ohio Constitution. The Plaintiffs then appealed the trial court's decision. In concluding that the 1995 program violated the Establishment Clause as well as one provision of the Ohio Constitution, the appeals court reversed the trial court's decision. Thereafter, the Defendants appealed that decision to the Ohio Supreme Court.

The 1995 program was struck down by the Ohio Supreme Court in *Simmons–Harris v. Goff,* 86 Ohio St.3d 1, 711 N.E.2d

not mean to diminish the importance of the instruction that each school participating in the Voucher Program offers in core subjects such as math, reading, science and social studies. Given the context within which this case is presented, however, the relevant question is not whether or how well these schools educate students in secular subjects, but whether the aid received through the Voucher Program violates the Establishment Clause. Accordingly, a review of the way in which religion is incorporated into the educational philosophy of participating schools is important to this court's analysis of the Voucher Program.

203 (1999). The court held that the program was enacted in violation of Section 15(D), Article II, of the Ohio Constitution in "that creation of a substantive program in a general appropriations bill violates the one-subject rule" found in that provision. *Id.* at 216. The Ohio Supreme Court also addressed the federal constitutional issue raised in that case, whether the pilot program violated the Establishment Clause of the First Amendment. It concluded, contrary to the holding of the Ohio Court of Appeals, that it did not.

The Voucher Program was enacted by the Ohio Legislature on June 29, 1999, as part of the Education Budget Bill. *See* Ohio Rev.Code § 3313.974–3313.979 (Anderson 1999). It is, in all respects pertinent to this litigation, the same as the original pilot scholarship program enacted by the Legislature in 1995, which was operative for three successive school years. As detailed above, the first challenge to the 1999 Program, case no. 1:99 CV 1740 was filed on July 20, 1999, and the second challenge, case no. 1:99 CV 1818, was filed on July 29, 1999.

On August 13, 1999, a preliminary injunction hearing was conducted in which the court entertained oral argument from counsel representing Plaintiffs in both cases, the State, and both groups of Intervening Defendants. After considering the submissions on behalf of all the parties and the arguments of counsel, this court issued its twenty-eight page order on August 24, 1999, granting Plaintiffs' Motion for a Preliminary Injunction.

On August 27, 1999, the court granted a limited stay of its order enjoining the Program. The stay was made applicable only to those students who were enrolled in the 1995 program during the previous academic year and was granted only for one semester or until the court rendered a final decision on permanent injunctive relief, whichever first occurred. In light of the limited stay, the court set an expedited discovery and trial schedule.

The court conducted telephone conferences with counsel for all parties on September 3 and 17, 1999, in order to make changes as needed to the discovery and trial schedules set by the court in its August 27, 1999 order. As a result of those conferences, the following discovery schedule was established. On September 10, 1999, counsel for all parties were to exchange proposed factual stipulations and requests for documents. Prior to September 17, 1999, counsel for all parties were ordered to attempt to agree upon the factual record which would serve as a basis for the consideration of any summary judgment motions to be filed. In the event that counsel were unable to agree upon a factual record, they had until September 22, 1999, to serve formal discovery requests and notices of deposition. Written discovery responses were due October 8, 1999. All remaining discovery was to be concluded by October 29, 1999. The schedule for the briefing of dispositive motions was set as follows: (a) the dispositive motion deadline was November 1, 1999; (b) responses were due November 15, 1999; and (c) replies were due November 23, 1999. As in the court's August 27, 1999 order, trial was scheduled for December 13, 1999, at 9:00 a.m.

On August 24, 1999, the State appealed this court's order granting Plaintiffs' Motion for Preliminary Injunction to the Sixth Circuit Court of Appeals. Both Intervening Defendants also filed notices of appeal. All Defendants requested a stay of this court's preliminary injunction pending appeal. After this court's August 27, 1999 order granting a limited stay of its preliminary injunction, all Defendants filed revised briefs with the Sixth Circuit, appealing the preliminary injunction with regard to students who were new to the Voucher Program.

While the aforementioned motions were pending before the Sixth Circuit, the State filed a motion for a stay of the preliminary injunction with the United States Supreme Court. On November 5, 1999, by a vote of

5–4, the Supreme Court granted the State's motion. The complete text of that order read:

> Treating the application as a request for a stay of the preliminary injunction, the application for stay presented to Justice Stevens and by him referred to the Court is granted. The preliminary injunction entered by the United States District Court for the Northern District of Ohio, case No. 99 CV 1740, on August 24, 1999, is stayed pending final disposition of the appeal by the United States Court of Appeals for the Sixth Circuit.

*Zelman, Superintendent of Pub. Instruction, et al. v. Simmons–Harris, Doris, et al.*, No. 99A320, —— U.S. ——, 120 S.Ct. 443, —— L.Ed.2d —— (U.S. Nov.5, 1999).

On November 15, 1999, the Sixth Circuit entered an order, wherein it concluded that the Supreme Court's decision granting the State's motion for a stay rendered moot the Defendants' motions for stay pending in that Court. In light of the expedited schedule set by this court, the Sixth Circuit placed all appeals in this matter in abeyance pending this court's final determination of the case.

### III. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law ....

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein .... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. at 2512.

Summary judgment is appropriate whenever the non-moving party fails to

make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

## IV. THE ESTABLISHMENT CLAUSE

### A. *History*

In promulgating the First Amendment, the framers of the Bill of Rights sought to protect the colonists' right to be free from government inculcation of the theologies and doctrines of a faith to which they did not subscribe. James Madison, one of the authors of the First Amendment, feared that without such protection, the risk of governmental oppression intensified: "Wherever the real power in a Government lies, there is the danger of oppression. In our Governments the real power lies in the majority of the community, and the invasion of private rights is *chiefly* to be apprehended, not from acts of Government contrary to the sense of its constituents, but from acts in which the Government is the mere instrument of the major number of the Constituents." James Madison to Thomas Jefferson, October 17, 1788, *reprinted in The Essential Bill of Rights* 326 (Gordon Lloyd et al. eds., University Press of America 1998) (emphasis in original). To Madison, the freedom to believe and practice the religion of one's choice was a fundamental right and was central to a bill of rights.

In his famous Memorial and Remonstrance in which he urged the State of Virginia to reject legislation which would financially support the propagation of Christianity as the state religion, Madison voiced his opinion on the proper relationship between government and religion: "[A] Government will be best supported by protecting every citizen in the enjoyment of his Religion with the same equal hand which protects his person and his property; by neither invading the equal rights of any sect, nor suffering any Sect to invade those of another." James Madison's Memorial and Remonstrance, June 20, 1785, *reprinted in The Essential Bill of Rights, supra,* at 228. The basis for his belief that the two should remain separate was his fear of what would happen to citizens if the government were to use laws to regulate their beliefs:

> The freemen of America did not wait till usurped power had strengthened itself by exercise, and entangled the question in precedents. They saw all the consequences in the principle, and they avoided the consequences by denying the principle. We revere this lesson too much soon to forget it. Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish, with the same ease, any particular sect of Christians, in exclusion of all other sects? That the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?

*Id.* at 226.

Thomas Jefferson's convictions and concerns mirrored those of Madison. In his Statute of Religious Liberty, he spoke out against the dangers of requiring citizens to

support a faith which was not their own: "[T]o compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical; that even the forcing him to support this or that teacher of his own religious persuasion, is depriving him of the comfortable liberty of giving his contributions to the particular pastor, whose morals he would make his pattern, and whose powers he feels most persuasive to righteousness ...." Jefferson's Statute of Religious Liberty, *reprinted in The Essential Bill of Rights, supra,* at 231.

Madison's and Jefferson's fears and concerns are reflective of those which resulted in the passage of the Establishment Clause—the first clause of the First Amendment of the U.S. Constitution. Its words are simple enough: "Congress shall make no law respecting an establishment of religion ...." Since its inception, though, the Establishment Clause has presented some of the most difficult questions of interpretation and application faced by the courts. As the Supreme Court has stated, "in many of these decisions 'we have expressly or implicitly acknowledged that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law.'" *Mueller v. Allen,* 463 U.S. 388, 393, 103 S.Ct. 3062, 3065–66, 77 L.Ed.2d 721 (1983) (quoting *Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971)).

While Madison and Jefferson may have espoused a belief in a firm wall between church and state, "a hermetic separation of the two is an impossibility [the Court] has never required." *Roemer, III v. Board of Pub. Works of Maryland,* 426 U.S. 736, 746, 96 S.Ct. 2337, 2344, 49 L.Ed.2d 179 (1976). The Supreme Court has "recognize[d] that sectarian schools perform secular, educational functions as well as religious functions, and that some forms of aid may be channeled to the secular without providing direct aid to the sectarian." *Committee for Pub. Educ. & Religious*

*Liberty v. Nyquist,* 413 U.S. 756, 775, 93 S.Ct. 2955, 2967, 37 L.Ed.2d 948 (1973). It is now clearly established that not every law which confers a benefit on a religious institution violates the Constitution. Some which confer only "indirect," "remote" or "incidental benefits" have been found to be constitutional. *See, e.g., Everson v. Board of Educ.,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). While line drawing has been difficult in actual cases, a brief examination of some of the Supreme Court's Establishment Clause decisions provides a useful background for assessing the constitutionality of the Voucher Program.

The Court has approved tax deductions for the costs of bus transportation by students, regardless of whether they attended public or private school, including parochial schools. *Id.* It also has approved the provision of textbooks at parochial schools when textbooks were not provided to students on the basis of whether they attended public or private school. *Board of Educ. v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). Until recently, the Court held that public employees could not provide instruction in secular subjects, such as giving remedial and accelerated instruction on the premises of religious institutions. *See, e.g., Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), *overruled by Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), *overruled by Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975). However, the Court reversed itself on this issue in *Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

The Court has generally held that a government cannot provide scholarship assistance to students which supports religious instruction or indoctrination. *Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948. However, it has approved of

scholarship assistance where the aid to students is provided as part of a program made generally available without regard to the public-nonpublic or sectarian-nonsectarian nature of the schools to be benefitted. In such circumstances, aid ultimately supports the educational program of a religious institution only as the result of the private choice of the aid recipient. Consequently, there is no religious indoctrination attributable to the government. The Court has also found that the eligibility criteria under this type of program are not such as to influence the recipient's choice of whether to attend a sectarian or nonsectarian institution. *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986); *Agostini,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391.

### B. *The Applicable Standard in Establishment Clause Cases*

■ Before reaching the merits of the parties' respective claims, it is necessary to identify the standard under which these claims are properly analyzed. The applicable test used to analyze Establishment Clause challenges is grounded in the principles set forth by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2125, 29 L.Ed.2d 745 (1971). In *Lemon,* the Supreme Court established the following three-part test:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive entanglement with religion.

*Id.* at 612–13, 91 S.Ct. at 2111 (citations omitted). If the challenged legislation fails to meet any part of this test, it violates the Establishment Clause. While the *Lemon* test is generally accepted as the cornerstone of Establishment Clause analysis, limits on its effectiveness in analyzing the myriad of factual scenarios that arise in this area of the law have been recognized. *See Hunt v. McNair,* 413 U.S. 734,

741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973) (reasoning that the *Lemon* test provides "no more than [a] helpful signpost" in analyzing Establishment Clause challenges.) Despite its perceived limitations, the Supreme Court has consistently applied this test in Establishment Clause challenges. *See Mueller,* 463 U.S. at 394, 103 S.Ct. at 3066; *Witters,* 474 U.S. at 485, 106 S.Ct. at 748.

Indeed, in *Agostini,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391, the Supreme Court recently reaffirmed the importance of the *Lemon* test in Establishment Clause cases. It confirmed the need to ascertain whether a law has a secular purpose and whether it has the effect of advancing religion, but altered the test's analytical structure by concluding that the "entanglement" prong should be considered as an aspect of the "effects" inquiry.

■ In collapsing the *Lemon* test from a three-prong to a two-prong inquiry, the *Agostini* Court also divided the second prong of the *Lemon* test into three specific sub-parts. According to *Agostini,* challenged governmental aid passes constitutional muster if it does not: "result in governmental indoctrination; define its recipients by reference to religion; or create an excessive entanglement." *Id.* at 234, 117 S.Ct. at 2016. As discussed *infra,* in clarifying the "effects" prong of the *Lemon* test, the Court did not substantially alter the analysis to be applied in Establishment Clause challenges to programs in which the government provides funding that directly aids the educational function of religious schools. The analysis in those cases under the first and second prongs of the test is still grounded in the principles set forth in *Lemon* and in cases applying the *Lemon* test.

Plaintiffs contend that the Voucher Program is unconstitutional under *Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948, because it is factually indistinguishable from the tuition reimbursement program struck down in that case. They

argue that the Voucher Program has the impermissible effect of advancing religion, as did the program at issue in *Nyquist*.[6] Defendants, on the other hand, argue that the Voucher Program is factually dissimilar from the program at issue in *Nyquist* and that this case should be governed by more recent Supreme Court cases in which the Court has found programs challenged under the Establishment Clause to be constitutional. In Section V, the court will review *Nyquist* and assess whether that case serves as precedent for this one and if so, whether the Voucher Program violates the Establishment Clause, as did the program in *Nyquist*. In Section VI, it will address Defendants' arguments that cases subsequent to *Nyquist* suggest there are meaningful distinctions between that case and this one.

## V. THE VOUCHER PROGRAM UNDER NYQUIST

### A. *Nyquist*

In *Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the Supreme Court found unconstitutional a New York State program intended to provide assistance, in several different forms, to nonpublic elementary and secondary schools. *Id.* The program contained three sections, only the second of which is directly relevant to the instant case. The first established direct money grants from the State to nonpublic, nonprofit elementary or secondary schools serving a high concentration of pupils from low-income families and was to be used for the maintenance and repair of school facilities. *Id.* at 762, 93 S.Ct. at 2960. The second section was a tuition grant program, which provided for partial tuition reimbursements to low-income parents whose children attend-

ed elementary or secondary nonpublic schools. *Id.* at 764, 93 S.Ct. at 2961. The last section gave some limited state income tax relief to parents who did not qualify for reimbursement grants. *Id.*

The tuition reimbursement program in *Nyquist* applied to parents of children who attended all private schools, not just private, sectarian schools. The reimbursement grants were limited to $50 for each grade school child and $100 for each high school child. *Id.* Only parents with an annual taxable income of less than $5,000 qualified for reimbursement. *Id.* In order to receive payment, a parent was required to submit a verified statement to the Commissioner of Education containing a receipted tuition bill. Reimbursements by the State could not exceed 50% of the tuition paid by the parents. *Id.*

Nearly 20% of New York State's elementary and secondary population attended over 2,000 nonpublic schools, and approximately 85% of these schools were church-affiliated.[7] *Id.* at 768, 93 S.Ct. at 2963. While no detailed factual record was developed in the underlying cases, the *Nyquist* Court noted that several pertinent generalizations could be made about the benefitted schools. The qualifying institutions could incorporate a number of religious characteristics, including:

(a) impos[ition of] religious restrictions on admissions; (b) requir[ing] attendance of pupils at religious activities; (c) requir[ing] obedience by students to the doctrines and dogmas of a particular faith; (d) requir[ing] pupils to attend instruction in the theology or doctrine of a particular faith; (e) [that the school is an] integral part of the religious mission of the church sponsoring it; (f) [that the school] ha[s] a substantial purpose the inculcation of religious values; (g) impos[ition of] religious restrictions on fac-

---

**6.** At the outset, it is important to note that Plaintiffs do not challenge the secular purpose of the Voucher Program.

**7.** It appears that the religious nature of a school was in part ascertained by reviewing

New York State Education Department records and determining whether such records identified a given school as church-affiliated. *See Nyquist,* 413 U.S. at 768 n. 23, 93 S.Ct. at 2963 n. 23.

ulty appointments; and (h) impos[ition of] religious restrictions on what or how the faculty may teach.

*Id.* at 768, 93 S.Ct. at 2963 (quoting *Committee for Pub. Educ. and Religious Liberty v. Nyquist*, 350 F.Supp. 655, 663 (S.D.N.Y.1972)). However, the Court made clear that "the characteristics of individual schools [could] vary widely from [this] profile." *Id.*

Applying the *Lemon* test, the Court first found that the tuition grant program easily passed the secular purpose test. The articulated purposes of the program were to promote pluralism and diversity among New York's public and nonpublic schools and to alleviate the concern that the State's overburdened public school system would suffer significant harm if a large portion of children who had been attending nonpublic schools decided to return to the public schools.

Under the "effects" prong of the *Lemon* test, the Supreme Court found the tuition reimbursement program, "designed to allow direct, unrestricted grants of $50 to $100 per child ... as reimbursement to parents in low-income brackets who send their children to nonpublic schools, the bulk of which is concededly sectarian in orientation," violated the Establishment Clause of the First Amendment. *Id.* at 780, 93 S.Ct. at 2969. There was no doubt, held the Supreme Court, that such grants "could not, consistently with the Establishment Clause, be given directly to sectarian schools ...." *Id.* The defendants argued that the program should be saved because the aid was delivered to the parents and was not given directly to the benefitted schools. *Id.* at 781, 93 S.Ct. at 2969. As support, they maintained that New York's tuition reimbursement program was similar to programs upheld by the Court in *Everson v. Board of Educ.*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), and *Board of Educ. v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). In *Everson*, the Court upheld tax deductions for parents who expended bus fare for children

who attended religious schools. The *Allen* Court upheld the furnishing of text books for children who attended parochial schools. In both cases, grants went directly to parents, and not to schools.

The *Nyquist* Court rejected the notion that the tuition deduction program was consistent with the Establishment Clause simply because aid went to the parents and not directly to the schools. As the Court explained, whether aid goes through parents or is given directly to schools is only one of many factors to be considered in determining whether or not a given program is unconstitutional. To clarify, the Court detailed the reasons why the programs upheld in *Everson* and *Allen* were significantly different from the nature of the tuition grants involved in *Nyquist*:

> In *Everson*, the Court found the bus fare program analogous to the provision of services such as police and fire protection, sewage disposal, highways, and sidewalks for parochial schools. Such services, provided in common to all citizens, are 'so separate and so indisputably marked off from the religious function,' that they may fairly be viewed as reflections of a neutral posture toward religious institutions. *Allen* is founded upon a similar principle. The Court there repeatedly emphasized that upon the record in that case there was no indication that textbooks would be provided for anything other than purely secular courses.

*Id.* at 781–82, 93 S.Ct. at 2970 (citations omitted).

Contrary to the grants at issue in *Everson* and *Allen*, the tuition grants in *Nyquist* were not restricted to supporting only secular aspects of a school's educational program. *Id.* at 783, 93 S.Ct. at 2971. There was no attempt to separate secular from religious educational functions and to ensure that the monies provided by the State supported only the former. Concluding that the program had the im-

permissible effect of advancing religion, the Court stated:

> Indeed, it is precisely the function of New York's law to provide assistance to private schools, the great majority of which are sectarian. By reimbursing parents for a portion of their tuition bill, the State seeks to relieve their financial burdens sufficiently to assure that they continue to have the option to send their children to religion-oriented schools. And while the other purposes for that aid—to perpetuate a pluralistic educational environment and to protect the fiscal integrity of overburdened public schools—are certainly unexceptionable, the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions.

*Id.*

Because the Court found that the tuition grant program at issue in *Nyquist* had the primary effect of advancing religion, it did not address the third prong of the *Lemon* test, whether the program fostered excessive entanglement between church and state.

Before analyzing the Voucher Program under *Nyquist*, it is important to note that the *Nyquist* Court found it significant that:

> [b]ecause of the manner in which we have resolved the tuition grant issue, we need not decide whether the significantly religious character of the statute's beneficiaries might differentiate the present cases from a case involving some form of public assistance (e.g., scholarships) made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited. Thus, our decision today does not compel, as appellees have contended, the conclusion that the educational assistance provisions of the 'G.I. Bill' impermissibly advances religion in violation of the Establishment Clause.

*Id.* at 782 n. 38, 93 S.Ct. at 2970 n. 38 (citations omitted). This language has been often-quoted in post-*Nyquist* Establishment Clause cases in which the Court

has concluded that the challenged programs were constitutional. As discussed below, Defendants argue that this case should be governed by these post-*Nyquist* cases because the Voucher Program is the type of program contemplated by the Court in footnote 38.

### B. *The Voucher Program*

#### 1. The Purpose of the Program

As in *Nyquist*, there is no question that the Voucher Program passes the secular purpose prong of the *Lemon* test. Indeed, as previously noted, Plaintiffs do not challenge the secular purpose of the legislation. Similar to *Nyquist*, the Program seeks to provide nonpublic school alternatives primarily to low-income students for acceptable reasons. Nevertheless, "the propriety of a legislature's purposes may not immunize from further scrutiny a law which ... has the primary effect that advances religion." *Id.* at 774, 93 S.Ct. at 2966. Thus, the next inquiry is whether the Voucher Program has the effect of advancing religion.

#### 2. The Effect of the Program

The Voucher Program is clearly similar to the tuition reimbursement program in *Nyquist* in two respects. First, while both public and private schools are eligible, only private schools have chosen to participate in the Program, and the vast majority of them are parochial. Like *Nyquist*, where 85% of the benefitted schools were parochial, over 82% of the schools participating in the Voucher Program are religiously affiliated. Thus, as in *Nyquist*, the "bulk of" the aid under the Voucher Program flows to schools which are "sectarian in orientation." *Id.* at 780, 93 S.Ct. at 2969. Second, as in *Nyquist*, the Voucher Program provides unrestricted tuition grants to parents whose children are eligible for the Program and who attend qualifying schools. Like the program in *Nyquist*, there " 'has been no endeavor to guarantee the separation between secular and reli-

gious educational functions and to ensure the State financial aid supports only the former.'" *Id.* at 783, 93 S.Ct. at 2971–72 (quoting *Lemon*, 403 U.S. at 613, 91 S.Ct. at 2111).

Defendants, however, argue that the programs are dissimilar in several ways which would require that the Voucher Program be upheld whereas the *Nyquist* program was struck down. First, the Intervening Defendants argue that even if the large majority of schools participating in the Voucher Program is sectarian, the Program is constitutional because the primary focus of the schools is secular education. They maintain that Voucher schools actually educate their students better than do public schools, asserting that "[i]f . . . Scholarship children receive a superior secular education and become better citizens because of their parent's school choice, the primary effect of the Program is secular rather than religious."[8] Def. Hanna Perkins Motion at 4–12.[9]

The *Nyquist* Court squarely addressed this argument. Focusing on the term "primary," defendants there asserted that the Court had to decide whether the New York law had the "primary effect" of subsidizing religion or promoting the secular objectives the Court found to be legitimate. In holding that a finding of the former did not necessarily preclude a finding of the latter, the Court said: "We do not think that such metaphysical judgments are either possible or necessary. Our cases simply do not support the notion that a law found to have a 'primary' effect to promote some legitimate end under the State's police power is immune

from further examination to ascertain whether it also has the direct and immediate effect of advancing religion." *Id.* at 783 n. 39, 93 S.Ct. at 2971 n. 39. Thus, even if it could be demonstrated that students participating in the Voucher Program receive a superior education to children in the Cleveland Public Schools, this fact does not obviate this court's duty to further question whether the Program also has the direct and immediate effect of advancing religion.

Second, citing to only several of the most religiously restrictive characteristics in the "profile" developed by the *Nyquist* Court, Defendants seek to distinguish that case by arguing that the schools participating in the Voucher Program do not exhibit each and every characteristic set forth in the *Nyquist* profile. Specifically, they argue that whereas the benefitted schools in *Nyquist* placed religious restrictions on admission, over sixty percent of the students in the Voucher Program are not of the same faith as their school's sponsor.

There is nothing in the *Nyquist* opinion to suggest that a program of this type runs afoul of the Establishment Clause only when the schools have the exact profile as in that case. The Court made clear that not each of the schools fit the profile, explicitly stating that "the characteristics of individual schools may vary widely from [the] profile." *Id.* at 768, 93 S.Ct. at 2963. More importantly, the *Nyquist* Court clearly did not rely on the fact that the schools in *Nyquist* were "extremely," as opposed to only "moderately" or "mildly" religious in reaching its conclusion. The relevant inquiry was whether schools were

8. Along the same lines, the State spends nearly one-third of its brief explaining how the primary effect of the Voucher Program is to provide experimental data on whether the availability of such a program will improve educational opportunities for disadvantaged students. According to the State, if a private school adequately teaches core secular subjects, "then the mere fact that . . . [the] school also teaches religion to its students cannot mean that the private school now suddenly serves the State's secular goals less well than

if it did not add religion to its teaching." Def. State Motion at 30.

9. As cited herein, the various briefs in support of the parties' respective positions are abbreviated as follows:

(1) briefs in support of motions for summary judgment are cited as "motion";
(2) briefs in opposition to motions for summary judgment are cited as "opp.";
(3) reply briefs are cited as "reply".

sectarian or nonsectarian. The *Nyquist* Court made this determination in part by reviewing the New York State Education Department records to identify whether such records listed a given school as church-affiliated. *Id.* at 768 n. 23, 93 S.Ct. at 2963 n. 23. The Court's conclusion that the vast majority of benefitted schools were sectarian was central to its finding that the program in *Nyquist* had the impermissible effect of advancing religion.

Finally, Defendants contend that because of the religious restrictions on admission, public school pupils could not enroll in the sectarian schools at issue in *Nyquist.* They maintain that this meant the sectarian schools in *Nyquist* received more money to educate their existing pupils in the same manner, thus acquiring extra funds to spend on religious icons, clergy salaries and the like. On the other hand, they argue, Voucher schools receive no such extra money because they must accept new, financially deprived children who are below grade level and need significant remedial assistance. According to Defendants, educating students with such needs costs the schools more than the payment they receive under the Voucher Program. *See, e.g.,* Def. Hanna Perkins Reply at 3; Def. Hanna Perkins Motion at 17. Furthermore, Defendants assert that the group who receives any "extra" money is parents, who are likely to spend it on "essential food, utilities or clothing." Def. Hanna Perkins Reply at 3–4.

Defendants' argument is not well-taken. The *Nyquist* program did not increase the amount of tuition received by the schools; it merely changed the source from which the tuition originated. That is, the State relieved the parents of their existing tuition bills. Moreover, Defendants' argument incorrectly assumes that the money the Voucher schools receive as a result of the tuition grants will be used only for secular purposes. However, the tuition grants under the Voucher Program, like those in *Nyquist,* are unrestricted and can be used for any purpose a school finds

necessary. That the grants do not fully compensate the schools for the cost of educating the children they accept under the Program does not alter this fact. Additionally, it is irrelevant that the funds in this case will benefit the parents of Voucher students. Parents clearly benefitted under the *Nyquist* program, as they do here. Nevertheless, as in *Nyquist,* the court must evaluate whether the Program *also* benefits the participating schools in such a way as to impermissibly foster religion.

Taken together, the fact that the Voucher Program overwhelmingly benefits sectarian schools and that the grants provided under the Program are not restricted to supporting only secular functions of a participating school's educational program make it indistinguishable for Establishment Clause purposes from the tuition reimbursement program in *Nyquist.* As in *Nyquist,* the funds provided under the Voucher Program directly aid the religious function of participating schools. In fact, the state aid under the Voucher Program provides an even more direct benefit to religious schools than did the aid in *Nyquist.* Even though parents must endorse their checks to the schools, the aid is given directly to participating schools. It can fairly be said that because the Program does not make aid available generally without regard to the nature of the institution benefitted, the Voucher Program results in government-sponsored religious indoctrination. Indeed, the Court's ultimate analysis of the *Nyquist* program under the "effects" test can be applied in this case by merely substituting "Ohio" for "New York": "[I]t is precisely the function of [Ohio's] law to provide assistance to private schools, the great majority of which are sectarian .... [T]he effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions." *Id.* at 783, 93 S.Ct. at 2971.

#### C. *Nyquist Has Not Been Overruled*

█ To the extent that Defendants argue implicitly in their motions for sum-

mary judgment, as they argued explicitly in their oppositions to Plaintiffs' motions for a preliminary injunction, that *Nyquist* has been "undermined" by a series of subsequent Supreme Court cases and should not be followed, the court must reject the argument. Since the court finds that *Nyquist* is directly relevant precedent, it is "constrained to follow it." *Simmons-Harris v. Zelman*, 54 F.Supp.2d 725, 735 (1999). In deciding to overrule one of its own precedents, the Supreme Court recently stated in *Agostini:*

> We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that "if a precedent to this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, **the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."**

*Agostini*, 521 U.S. at 237, 117 S.Ct. at 2017 (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989))(emphasis added). Thus, it is not within the power of this court to declare that a case decided by the United States Supreme Court should be overruled.

## VI. ESTABLISHMENT CLAUSE JURISPRUDENCE SINCE NYQUIST

As previously discussed, the *Nyquist* Court did not have before it the type of case contemplated in footnote 38, wherein funds are "made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited." *Nyquist*, 413 U.S. at 782 n. 38, 93 S.Ct. at 2970 n. 38. However, the Court was later confronted with just such a scenario in several cases following *Nyquist*. The dispute in the instant matter revolves around Defendants' contention

that the Voucher Program fits within footnote 38 and cases following *Nyquist*. Accordingly, the court turns to a discussion of whether recent cases suggest there is a meaningful distinction between the program struck down in *Nyquist* and that which is being challenged in this case.

### A. Mueller

In *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), the U.S. Supreme Court upheld the constitutionality of a Minnesota statute which allowed state taxpayers to deduct, when computing their state income tax, certain tuition, transportation and educational expenses actually incurred in sending their children to elementary or secondary schools. It found that the program complied with each of the three parts of the *Lemon* test. The court determined that the program had a secular legislative purpose, stating:

> A state's decision to defray the cost of educational expenses incurred by parents—regardless of the type of schools their children attend—evidences a purpose that is both secular and understandable. An educated populace is essential to the political and economic health of any community, and a state's efforts to assist parents in meeting the rising cost of educational expenses plainly serves this secular purpose of ensuring that the state's citizenry is well educated. Similarly, Minnesota, like other states, could conclude that there is a strong public interest in assuring the continued financial health of private schools, both sectarian and non-sectarian. By educating a substantial number of students such schools relieve public schools of a correspondingly great burden—to the benefit of all taxpayers.

*Id.* at 395, 103 S.Ct. at 3067.

The Court also concluded that the program did not have the primary effect of advancing religion. First, it explained that the tax deduction was one of many provided under the Minnesota tax laws and that its:

decisions consistently have recognized that traditionally '[l]egislatures have especially broad latitude in creating classifications and distinctions in tax statutes,' in part because the 'familiarity with local conditions' enjoyed by the legislators especially enables them to 'achieve an equitable distribution of the tax burden.' Under our prior decisions, the Minnesota legislature's judgment that a deduction for educational expenses fairly equalizes the tax burden of its citizens and encourages desirable expenditures for educational purposes is entitled to substantial deference.

*Id.* at 396, 103 S.Ct. at 3067–68 (citations omitted).

According to the Court, it was especially significant that the deduction was available for education expenses incurred by all parents, whether their children attended public schools, nonsectarian private schools or sectarian private schools. *Id.* at 397, 103 S.Ct. at 3068. The Court found this aspect of the statute, as well as others, to be "vitally different from the scheme struck down in *Nyquist.* There, public assistance amounting to tuition grants was provided only to parents of children in nonpublic schools." *Id.* at 398, 103 S.Ct. at 3068. The Court found the tax deduction involved to be more like the type of program contemplated in footnote 38 of *Nyquist,* wherein the Court "intimated that 'public assistance (e.g., scholarships) made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited,' might not offend the Establishment Clause." *Id.* (citation omitted).

While acknowledging that "financial assistance provided to parents ultimately has an economic effect comparable to that of aid given directly to the schools attended by their children," central to the Court's reasoning was the fact that the assistance to parochial schools was channeled through parents rather than directly provided to the schools. *Id.* at 399, 103 S.Ct.

at 3069. In *Mueller,* the nature of the program at issue necessarily incorporated several significant steps between the aid provided by Minnesota and the benefit religious schools might indirectly receive from such aid. Although the Court did not explicitly delineate these steps, some of them are apparent. At the outset, parents had to decide whether to send their child to public or private, tuition-charging schools. Next, they had to determine whether their child should attend a sectarian or nonsectarian private school. Once their child was enrolled in a private school, the tuition bill was due from parents upfront. Before being able to reap its benefits, it was necessary that parents become aware of the tuition deduction. Finally, it was not certain that because their child attended a private school, parents would automatically take the deduction; rather, parents had to make the choice to take advantage of it. As the Court explained, "[t]he historic purposes of the [Establishment] [C]lause simply do not encompass the sort of attenuated financial benefit, ultimately controlled by the private choices of individual parents, that eventually flows to parochial schools from the neutrally available tax benefit at issue in this case." *Id.* at 400, 103 S.Ct. at 3070.

Because the Court found that the program in *Mueller* "neutrally provide[d] state assistance to a broad spectrum of citizens" and because "under Minnesota's arrangement public funds be[came] available only as a result of numerous, private choices of individual parents of school-age children," it concluded that the program did not have the primary effect of advancing religion. *Id.* at 398–99, 103 S.Ct. at 3069.

Defendants argue that because the Court in *Mueller* indicated it would not base the constitutionality of a program on the consideration of yearly statistical evidence reflecting the extent to which nonsectarian schools might benefit from the

tax deduction,[10] this court should not consider statistical evidence indicating the number of parochial schools involved in the Program. Defendants also contend that the Voucher Program complies with the dictates of *Mueller* and footnote 38 of *Nyquist* because it is a facially neutral program. Defendants assert that, because the Program is facially neutral, the challenged aid is made generally available without regard to the sectarian-nonsectarian or public-nonpublic nature of the institutions benefitted. Therefore, they argue, any benefit received by a sectarian institution is received as a result of the private choice of the individual parents.

Contrary to Defendants' assertions, *Mueller* cannot fairly be read as repudiating the obligation of the courts in the first instance to see whether the state program is indeed genuinely neutral. The *Mueller* Court's refusal to consider annual reports reciting the number of parents who availed themselves of the tax deduction at issue must be evaluated in the entire context of its decision. Over the dissent of Justices Marshall, Brennan, Blackmun and Stevens, the Court found, on analysis, that the tax deduction was "made available without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution[s] benefitted" and that it benefitted religious institutions "only as a result of numerous private choices of individual parents of school-age children." 463 U.S. at 399, 103 S.Ct. at 3069. These two facts meant that the link between state aid and the religious schools was sufficiently attenuated such that the receipt of the tax deduction by private citizens did not offend the Establishment Clause. *See id.* ("Where, as here, aid to parochial schools

is available only as a result of decisions of individual parents no 'imprimatur of State approval,' can be deemed to have been conferred on any particular religion, or on religion generally." (Citation omitted)). In light of this conclusion, it follows that a statistical analysis indicating how many private citizens took advantage of the tax deduction could not weigh into the Court's analysis of the challenged statute's constitutionality. Whether 5% or 100% of students taking advantage of the deductions attended religious schools was of no constitutional consequence in the face of a determination by the Court that the options were neutral and that any aid benefitting religious institutions was the result of private choice.

Consideration of the number and percentage of sectarian schools participating in the Voucher Program is not forbidden by *Mueller.* Assessing the choices available to students in the Program by determining the number of participating religious schools versus the number of participating nonreligious schools is very different than annually taking account of the number of students who have availed themselves of a particular option. In other words, determining whether an aid recipient has neutral options available under a program is not the same as probing how the recipient has chosen to exercise those options. Indeed, the Court has employed a prospective analysis in post-*Mueller* Establishment Clause challenges in an effort to determine the availability of neutral options under a program. *See e.g., Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 488, 106 S.Ct. 748, 752, 88

10. Defendants base this argument on the following language from the *Mueller* opinion: We need not consider these contentions in detail. We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on annual reports reciting the extent to which various classes of private citizens claimed benefits under the law. Such an approach would scarcely provide the certainty that this field stands in need of, nor can

we perceive principled standards by which such statistical evidence might be evaluated. Moreover, the fact that private persons fail in a particular year to claim the tax relief to which they are entitled—under a facially neutral statute—should be of little importance in determining the constitutionality of the statute permitting such relief.
*Mueller,* 463 U.S. at 401, 103 S.Ct. at 3070.

L.Ed.2d 846 (1986) (finding it significant that "the full benefits of the program [were not] limited, in large part or in whole, to students at sectarian institutions. On the contrary, aid recipients ha[d] full opportunity to expend vocational rehabilitation aid on wholly secular education, and as a practical matter have rather greater prospects to do so. Aid recipients' choices are made among a huge variety of possible careers, of which only a small handful are sectarian.").

Defendants' reliance on *Mueller* for the proposition that the court should consider only the face of the relevant statute is also misplaced. On numerous occasions, the Supreme Court has held that, by itself, facial neutrality is insufficient to clear the effects test. For example, in *Bowen v. Kendrick*, 487 U.S. 589, 609–10, 108 S.Ct. 2562, 2574, 101 L.Ed.2d 520 (1988), the Court concluded:

> Of course, even when the challenged statute appears to be neutral on its face, we have always been careful to ensure that direct government aid to religiously affiliated institutions does not have the primary effect of advancing religion. One way in which direct government aid might have that effect is if the aid flows to institutions that are "pervasively sectarian."

In *Roemer, III v. Maryland Pub. Works Bd.*, 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976), the Court held:

> Neutrality is what is required. The State must confine itself to secular objectives, and neither advance nor impede religious activity. Of course, that principle is more easily stated than applied. The Court has taken the view that a secular purpose and a facial neutrality may not be enough, if in fact the State is lending direct support to a religious ac-

tivity. The State may not, for example, pay for what is actually a religious education, even though it purports to be paying for a secular one, and even though it makes its aid available to secular and religious institutions alike.

*See also Rosenberger v. Rector and Visitors of the Univ. of Virginia et al.*, 515 U.S. at 846, 115 S.Ct. at 2525 (1995) (O'Connor, J., concurring) ("Neutrality, in both form and effect, is one hallmark of the Establishment Clause.").

*Mueller* itself adheres to this principle. The Court explicitly followed each step of the *Lemon* test—once it determined the program at issue had a secular purpose, it "turn[ed] ... to the more difficult but related question whether the Minnesota statute ha[d] 'the primary effect of advancing the sectarian aims of the nonpublic schools.'" *Id.* at 396, 103 S.Ct. at 3067 (quoting *Committee for Pub. Educ. v. Regan*, 444 U.S. 646, 662, 100 S.Ct. 840, 851, 63 L.Ed.2d 94 (1980) and *Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111). The Court determined that the program, *in addition* to being facially neutral, was also neutral in application because aid was provided without regard to the nature of the institutions benefitted and because aid only flowed to religious institutions as a result of the independent choices of parents. Accordingly, the program did not have the primary effect of advancing religion.[11]

On analysis of the Voucher Program's form and effect, the court finds it distinguishable from *Mueller* in at least two pertinent respects. First, under the Voucher Program, parents and their children do not have a significant choice between parochial and nonparochial schools. The Program is structured such that eligible schools become registered schools only if they choose to accept the government's invitation to participate. Although the

---

**11.** Although Defendants also argue that the Tutorial Program contributes to the facial neutrality of the Voucher Program, they fail to assert how it contributes to the Voucher Program's neutrality in application. Accord-

ingly, inasmuch as the court has concluded that facial neutrality is insufficient to satisfy the "effects" test, Defendants' argument relative to the Tutorial Program is not well-taken.

Voucher Program lists several adjacent school districts as eligible schools, none have registered for the Program. Because analysis of the Program's constitutionality requires consideration of where the challenged aid actually flows, the court is obligated to consider only registered schools, not eligible schools. Among registered schools, parochial schools overwhelmingly predominate. Therefore, this Program is unlike the tax program in *Mueller* where parents and children could make an independent choice between public and private schools, including religious schools, and where parents received a tax deduction for expenses associated with attendance at either.[12] Second, because parents of children in the Voucher Program do not have a significant choice between parochial and nonparochial schools, the nature of that choice is not sufficient to break the nexus between the government and the religious institution. Thus, parental choice under the Voucher Program is unlike that in *Mueller*, where the aid was found to be neutral and made available without regard to the sectarian-nonsectarian or public-nonpublic nature of the institutions benefitted.

### B. *Witters*

The Supreme Court, in *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), upheld the constitutionality of a State of Washington program extending vocational rehabilitation assistance to a blind person attending a Christian college to become a pastor, missionary or youth director. The program at issue authorized the Washington Commission for the Blind to "[p]rovide for special education and/or training in the professions, business or trades so as to assist visually handicapped persons to overcome vocational handicaps and to obtain the maximum degree of self-support and self-care." *Id.* at 483, 106

S.Ct. at 749 (citation omitted). The plaintiff in *Witters* wished to apply his grant to defray his tuition costs at the Inland Empire School of the Bible, the private Christian college where he was studying.

The Court had no trouble determining that the program satisfied the first part of the *Lemon* test. As the court explained, the purpose of the Washington program was "unmistakably secular [in that it] . . . was designed to promote the well-being of the visually handicapped through the provision of vocational rehabilitation services." *Id.* at 485, 106 S.Ct. at 751. Further, the Court specifically noted that "no more than a minuscule amount of the aid awarded under the program is likely to flow to religious education." *Id.* at 486, 106 S.Ct. at 751.

In addressing the effects prong of the test, the Court stated:

> The question presented is whether, on the facts as they appear in the record before us, extension of aid to petitioner and the use of that aid by petitioner to support his religious education is a permissible transfer similar to the [constitutionally permissible] hypothetical salary donation [by a public employee to a religious institution], or is an impermissible "direct subsidy."

*Id.* at 488, 106 S.Ct. at 751. Unlike the *Nyquist* program, the vocational assistance program at issue did not amount to a direct subsidy because "any aid provided under Washington's program that ultimately flow[ed] to religious institutions d[id] so only as a result of the genuinely independent and private choices of aid recipients." *Id.*

In reaching the conclusion that the link between the religious institution and the State was sufficiently attenuated, the Court found several aspects of the pro-

---

**12.** Citing with approval to the factual findings of the lower courts in that case, the Court in *Mueller* detailed "a range of educational expenses" for which parents of public school children may claim the tax deduction. *See*

*Mueller,* 463 U.S. at 391 n. 2, 103 S.Ct. at 3064 n. 2. This appeared central to the Court's conclusion that the program was neutral.

gram pertinent. First, the vocational assistance was paid directly to the student, who could expend his or her education grant on wholly secular education if he or she wished. The program did not create a financial incentive for students to attend sectarian institutions because it did not provide any greater or broader benefits to students who chose to apply their aid to religious education. It was significant that:

> the full benefits of the program [were not] limited, in large part or in whole, to students at sectarian institutions. On the contrary, aid recipients ha[d] full opportunity to expend vocational rehabilitation aid on wholly secular education, and as a practical matter have rather greater prospects to do so. Aid recipients' choices are made among a huge variety of possible careers, of which only a small handful are sectarian .... Further, and importantly, nothing in the record indicates that, if petitioner succeeds, any significant portion of the aid expended under the Washington program as a whole will end up flowing to religious education.

*Id.*

Upon analysis, the Court found that Washington's program fit within footnote 38 of *Nyquist* because "Washington's program is 'made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited.' *Committee for Pub. Educ. & Liberty v. Nyquist,* 413 U.S. at 782–83 n. 38, 93 S.Ct. at 2970 n. 38, and is in no way skewed toward religion ...." *Id.* As the Court determined, "the mere circumstance that petitioner has chosen to use neutrally available state aid to help pay for his religious education [does not] confer any message of state endorsement of religion." *Witters,* 474 U.S. at 489, 106 S.Ct. at 752.

Defendants point to *Witters* as support for essentially the same arguments they raise in connection with *Mueller.* As the Senel–Taylor Intervenors/Defendants state, *Witters* "stands for the proposition

that a facially neutral program that offers benefits to a class defined without reference to religion does not have a primary effect of advancing religion where any aid to religion results from the private choices of individual beneficiaries, even where a very high proportion of the beneficiaries are using their benefits to pursue a religious option." Def. Taylor Opp. at 14. The court does not disagree with this statement. Nevertheless, it does not agree that *Witters* should change the outcome of this case.

The court first incorporates its discussion regarding *Mueller* herein as much of it directly relates to Defendants' contentions with regard to *Witters.* Next, it will briefly explain why *Witters* is perhaps even easier to distinguish from the instant case than *Mueller.* First, in *Witters,* the student had a genuine choice between attending sectarian or nonsectarian and public or nonpublic institutions. Indeed, he had a choice between pursuing religious and nonreligious vocations, and as a practical matter, had a great many more nonreligious options. Because he could utilize the aid however he chose, the provision of the scholarship would have no effect on his choice of an institution. Benefits would not accrue "in large part or in whole" to students at sectarian institutions. In fact, under the program, only a "minuscule" amount of aid would ever flow to religious institutions, and the program was not in any way skewed toward religion. Though religious institutions might ultimately benefit, it would be only as a direct result of the choice of recipients, not as the result of the State directly providing a benefit. To the contrary, students in the Voucher Program have no meaningful choice between attending sectarian or nonsectarian schools. That choice is essentially made for them as a function of the fact that almost all participating schools are religious in nature. Unlike in *Witters,* nearly all state aid under the Voucher Program will flow to religious institutions. It cannot be said that this aid flows to those

institutions as a result of the choice of the Program beneficiaries since nearly all the schools participating are religious. Accordingly, it is not true, as it was in *Witters*, that the Voucher Program "is in no way skewed toward religion;" in fact, just the opposite is true here. Thus, *Witters* does not apply to this case because it is not true under the Voucher Program that "aid to religion results from the private choices of individual beneficiaries."

### C. *Zobrest*

In *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), the Supreme Court held that providing the services of an interpreter to a deaf student attending a Catholic high school pursuant to the Individuals With Disabilities Education Act (IDEA), 20 U.S.C. § 1407 *et seq.*, and its Arizona counterpart did not violate the Establishment Clause. The student had previously attended public school where he was furnished such an interpreter.

Holding that the reasoning of *Mueller* and *Witters* applied to the program at issue, the Court found that the effect of the government program was not to promote religion. *Id.* at 10, 113 S.Ct. at 2467. Rather, the services at issue were part of a general program that "distribute[d] benefits neutrally to any child qualifying as 'disabled' under IDEA, without regard to the 'sectarian-nonsectarian, or public-nonpublic nature' of the school the child attend[ed]." *Id.* The Court reasoned:

[b]y according parents freedom to select a school of their choice, the statute insures that a government-paid interpreter will be present in a sectarian school only as a result of the private decision of individual parents. In other words, because the IDEA creates no financial incentive for parents to choose a sectarian school, an interpreter's presence there cannot be attributed to state decision-making.

\*    \*    \*    \*    \*    \*

When the government offers a neutral service on the premises of a sectarian school as part of a general program that 'is no way skewed toward religion,' it follows under our prior decisions that provision of that service does not offend the Establishment Clause.

*Id.* (citations omitted). Indeed, the Court found the case to be easier than *Mueller* and *Witters* because no state monies that were traceable to the government ever went to religious institutions. *Id.*

It was also significant that the IDEA did not relieve the school at which the student wished to utilize the services of his interpreter of an expense it otherwise would have assumed in educating its students. *Id.* at 12–13, 113 S.Ct. at 2468–69. In other words, the Court intimated that even programs in which money does not directly flow to the coffers of a religious institution can still violate the Establishment Clause if aid is provided in such a way as to free up institution funds that would otherwise have been expended on essential, religious or nonreligious, functions. However, because the IDEA neither gave money directly to schools nor relieved them of expenses they would otherwise have borne, it did not amount to an impermissible direct subsidy to sectarian institutions. As the Court explained, because aid only went to religious institutions as a result of the genuinely independent choices of recipients, "[d]isable[d] children, not sectarian schools, [were] the primary beneficiaries of the IDEA; to the extent sectarian schools benefit[ted] at all from the IDEA, they [were] only incidental beneficiaries. Thus, the function of the IDEA [was] hardly to provide desired financial support for nonpublic, sectarian institution." *Id.* at 13, 113 S.Ct. at 2469 (citation omitted).

Finally, the Court reasoned that "the Establishment Clause lays down no absolute bar to the placing of a public employee in a sectarian school." *Id.* It would not assume that the sign-language interpreter would do anything more than "accurately interpret whatever material [was] present-

ed to the class as a whole." *Id.* As the Court stated, "ethical guidelines require interpreters to transmit everything that is said in exactly the same way it was intended." *Id.* Any argument by Defendants that the Voucher Program is constitutional under *Zobrest* is not well-taken. As discussed above, the Voucher Program is not neutral because it does not make aid available generally without regard to the nature of the institutions benefitted. Since more than 82% of the schools participating in the Program are sectarian in nature, it also cannot be said that aid only flows to sectarian institutions as a result of the genuine and independent choice of aid recipients. Furthermore, unlike the IDEA, the Program does directly subsidize sectarian institutions. Because all monies under the Program flow directly to the coffers of religious schools, it is unnecessary to take the next step as the Court did in *Zobrest* and determine whether the Program relieves the schools of expenses they otherwise would have had to bear. Moreover, as the funds are unrestricted, there are no safeguards in the Voucher Program to ensure that they will be used only for secular instruction. Finally, it is important that *Zobrest* is factually dissimilar from this case. Central to the Court's decision was a rejection of the notion that the presence of a public employee in a sectarian school automatically violates the Establishment Clause, especially in the case of a sign language interpreter, who could neither add to nor subtract from the learning environment. On the other hand, where a school receives direct, unrestricted funds for its educational program, it hardly can be said that such aid does not result in indoctrination.

### D. *Agostini*

The most recent case to hold that a governmental program which provided benefits to religious schools withstood an Establishment Clause challenge is *Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). In that case, the Supreme Court overruled its prior decisions in *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), *overruled by Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); and *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 400, 105 S.Ct. 3216, 3231, 87 L.Ed.2d 267 (1985), *overruled by Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). In *Aguilar,* the Court had held that the Establishment Clause barred New York City from sending public school teachers into parochial schools to provide remedial education to disadvantaged children under a congressionally mandated program, Title I of the Elementary and Secondary Education Act of 1965. In *Ball,* the Court found unconstitutional a program implemented by the City of Grand Rapids, Michigan, under which nonpublic school students were taught supplemental courses by public school teachers during the regular school day on the premises of nonpublic schools. *Agostini,* 521 U.S. at 218–22, 117 S.Ct. at 2008–10.

In overruling *Aguilar* and *Ball,* the Court affirmed that the basic principles of Establishment Clause jurisprudence had not changed. However, it announced a restructuring of the *Lemon* test. It concluded that the test should be viewed as having two prongs instead of three. The first would continue to be the secular purpose prong and the second would continue to be the effects prong. According to the Court, consideration of whether a program fosters excessive entanglement between church and state, formerly the third prong of the *Lemon* test, should more properly be considered "as an aspect of the inquiry into a statute's effect." *Id.* at 233, 117 S.Ct. at 2015. The Court also clarified the criteria used to determine whether government aid has the effect of advancing religion, indicating that the Court currently employs three criteria: whether the challenged governmental aid (1) results in governmental indoctrination; (2) defines its recipients by reference to religion; or (3) creates an excessive entanglement. *Id.*

In analyzing its post-*Aguilar* and *Ball* decisions, the Supreme Court concluded that the approach used to assess religious indoctrination had changed in "two significant respects." *Id.* at 223, 117 S.Ct. at 2010. First, citing primarily to *Zobrest*, the Court explained that it had rejected the two principal presumptions upon which *Ball* and *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), had rested. The first of these discarded presumptions was "that the placement of public employees on parochial school grounds inevitably results in the impermissible effect of state-sponsored indoctrination or constitutes a symbolic union between government and religion." *Id.* The Court stated: "There is no reason to presume that, simply because she enters a parochial school classroom, a full-time public employee such as a Title I teacher will depart from her assigned duties and instructions and embark on religious indoctrination, any more than there was a reason in *Zobrest* to think an interpreter would inculcate religion by altering her translation of classroom lectures." *Id.* at 226, 117 S.Ct. at 2012. The second abandoned presumption was that "the presence of a public employee on private school property creates an impermissible 'symbolic link' between government and religion." *Id.* at 224, 117 S.Ct. at 2011. According to the Court, there is no "perceptible ... difference in the degree of symbolic union between a student receiving remedial instruction in a classroom on his sectarian school's campus and one receiving instruction in a van parked just at the school's curbside." *Id.* at 227, 117 S.Ct. at 2012.

Second, citing *Witters*, the Court indicated that it had departed from the rule "that all government aid that directly aids the educational function of religious schools is invalid." *Id.* at 225, 117 S.Ct. at 2011. The Court went on to explain that departure is warranted in programs that are in conformity with the requirements discussed in footnote 38 of *Nyquist*, such as *Witters*. According to the Court, direct aid programs in which grants are "made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited" are constitutional. *Id.* at 225, 117 S.Ct. at 2011 (quotations omitted). The Court also reiterated that programs like those in *Witters* and *Zobrest*, where money ultimately goes to religious institutions "only as a result of the genuinely independent and private choices of" individuals, satisfy footnote 38's criteria. *Id.* at 226, 117 S.Ct. at 2012. In such cases, religious indoctrination could not be attributed to the state.

It was also significant that under current law, the Court could not conclude that placing public employees on parochial campuses to provide Title I instruction would impermissibly finance religious indoctrination. *Id.* at 228, 117 S.Ct. at 2012. First, aid under Title I was provided to students regardless of the school they chose to attend. Second, relying on the reasoning in *Zobrest*, the Court found it important that, by law, Title I services were supplemental to the schools' regular curricula. *Id.*, 117 S.Ct. at 2013. As the Court stated:

> These services do not, therefore, 'reliev[e] sectarian schools of costs they otherwise would have borne in educating their students.' *Zobrest*, 509 U.S., at 12, 113 S.Ct., at 2468 .... Title I services are [not necessarily] distributed ... 'directly to the religious schools' .... In fact, they are not. No Title I funds ever reach the coffers of religious schools, compare *Committee for Pub. Educ. & Religious Liberty v. Regan*, 444 U.S. 646, 657–659, 100 S.Ct. 840, 848–849, 63 L.Ed.2d 94 (1979) (involving a program giving 'direct cash reimbursement' to religious schools for performing certain state mandated tasks).

*Id. See also Peck v. Lansing Sch. Dist.*, 148 F.3d 619 (1998) (finding that federally funded program providing services on parochial school campuses does not run afoul of the Establishment Clause as long as instruction is supplemental to regularly provided services, award of funding is

based on neutral criteria, and program imposes adequate safeguards to ensure that instruction provided is secular).

■ The Court stated in regard to the second effects criteria, that the program not "define its recipients by reference to religion":

> A number of our Establishment Clause cases have found that the criteria used for identifying beneficiaries are relevant in a second respect, apart from enabling a court to evaluate whether the program subsidizes religion. Specifically, the criteria might themselves have the effect of advancing religion by creating a financial incentive to undertake religious indoctrination. Cf. *Witters, supra*, at 488, 106 S.Ct., at 752 (upholding neutrally available program because it did not "create a financial incentive for students to undertake sectarian education"); *Zobrest, supra*, at 10, 113 S.Ct., at 2467 (upholding neutrally available IDEA aid because it "creates no financial incentive for parents to choose a sectarian school").

*Id.* at 230–32, 117 S.Ct. at 2014. The above-cited quote makes it clear that if a program is found not to involve state indoctrination, it may still run afoul of the Establishment Clause based on the ground that the criteria for participation in the program provides an incentive to pursue religious indoctrination. Applying this principle to the program in *Agostini*, the Court found that no such incentive to pursue indoctrination was present. As it stated: "Title I services are allocated on the basis of criteria that neither favor nor disfavor religion. The services are available to all children who meet the Act's eligibility requirements, no matter what their religious beliefs or where they go to school." [13] *Id.* at 232, 117 S.Ct. at 2014 (citations omitted).

The court does not find that *Agostini* undermines the vitality of *Nyquist* or oth-erwise supports Defendants' argument that the Voucher Program does not violate the Establishment Clause. The *Agostini* Court, while acknowledging that it no longer applied an absolute rule that all direct aid which supports religious institutions is barred by the Establishment Clause, made clear that the circumstances where such aid is permissible are in the context of cases like *Witters*, a class of cases different than that in *Nyquist*. In reversing its prior decision in *Aguilar* so that Title I services could be provided to students on the grounds of religious institutions, *Agostini* simply allowed students attending parochial schools to obtain remedial educational benefits which were made generally available to qualifying students without regard to the nature of the institution attended. Indeed, in *Agostini*, no monies ever went into the coffers of the religious institution and there clearly was no direct support for such institutions. The provision of services also would have no effect on a student's choice of what school to attend because the services could be utilized at any school. In one sense, such a program is similar to providing textbooks in math or science to all students regardless of the school they attend.

An analysis of the Voucher Program under the *Agostini* framework makes it clear that it runs afoul of both the indoctrination prong and the financial incentives prong of the effects test. First, this is not a program made neutrally available without regard to the religious-nonreligious, public-nonpublic nature of the institutions to be benefitted. Since there are very few nonreligious options for eligible students, one also cannot say that the decision to attend a religious school under the Voucher Program was made as a result of the genuinely independent choice of aid recipients. As discussed above in connection with *Zobrest*, it is unnecessary to determine whether the Voucher Program "re-

---

**13.** The Court ultimately found the Title I program constitutional because it also did not violate the third prong of the "effects" test as it did not create excessive entanglements between church and state.

liev[es] sectarian schools of costs they otherwise would have borne in educating their students" because funds go directly to the coffers of religious schools. Again, there are no limitations on how the funds are to be used; thus, there are no adequate safeguards to ensure that instruction provided is secular. Accordingly, this is not the type of case in which the Court would find it warranted to depart from the rule that government aid that directly aids the educational function of a religious institution is invalid.

Second, program criteria create incentives for students to attend religious schools. Contrary to *Agostini,* students in the Voucher Program may not use their vouchers at any school they wish. Rather, they must attend a school that has chosen to participate in the Voucher Program, and the overwhelming majority of such schools are sectarian in nature. Accordingly, the provision of the services under the Voucher Program directly impacts whether a recipient chooses a religious institution.

Thus, the court concludes that the Voucher Program violates the Establishment Clause under *Agostini* because it results in prohibited governmental indoctrination and because it defines its recipients by reference to religion.

### E. *Rosenberger*

The State relies upon *Rosenberger v. Rector and Visitors of the University of Virginia, et al.,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), for the contention that it would be unconstitutional to exclude religious private schools from the Voucher Program, as such exclusion based solely on religion would be content-based discrimination in violation of the Free Speech Clause and would deprive religious schools and families of their equal right to pursue religious study.[14] Def. Memo in Supp. of Motion to Dismiss at 1. In *Rosenberger,* the University of Virginia had established a Student Activities Fund

("SAF") to which student groups could submit disbursement requests for certain extracurricular activities, including the printing of student publications. The SAF received its money from a mandatory fee assessed per semester to each full-time University student. "Religious activities," those activities which "primarily promote[d] or manifest[ed] a particular belie[f] in or about a deity or an ultimate reality," were excluded from SAF support. *Id.* at 824–825, 115 S.Ct. at 2514–15.

When one student group published a magazine entitled "Wide Awake: A Christian Perspective at the University of Virginia," the Student Council Appropriations Committee refused to authorize payment of the magazine's printing costs on the ground that it was a "religious activity." The student group filed suit, alleging that the University's refusal to authorize payment solely on the basis of the publication's religious editorial viewpoint violated its rights to freedom of speech and press, to the free exercise of religion, and to equal protection of the law. *Id.* at 827, 115 S.Ct. at 2516. The *Rosenberger* Court held that denial of funding to Wide Awake violated the Free Speech Clause of the First Amendment as it amounted to viewpoint discrimination. *Id.* at 837, 115 S.Ct. at 2520.

The State's argument is premised on the erroneous assumption that the present situation, like *Rosenberger,* offers only two alternatives. In *Rosenberger* there were two clear alternatives—the University could either provide funding, or refuse funding, of the student publication. The State urges that if the court finds the Voucher Program unconstitutional, there is only one alternative left: to exclude all sectarian schools from any such program, based solely on their religious affiliation. Essentially, Defendants invite this court to render an advisory opinion on the constitutionality of such an alternative. The court declines Defendants' invitation. It simply

---

**14.** The State primarily raised this argument in its motion to dismiss, but incorporated it by reference into their motion for summary judgment.

holds that a program which provides no meaningful choice to scholarship recipients other than to attend sectarian schools violates the Establishment Clause.

### F. Relevance of Non–Program Options

■ Defendants argue that, when the entire universe of educational alternatives offered by the State of Ohio is considered, the Voucher Program is but one "choice" among many, primarily nonsectarian, educational options. They include community schools and magnet schools among the options the court should consider alongside the Voucher Program.[15] They maintain that "the Scholarship Program, as part of the State's experimentation with various forms of school choice, is a genuinely neutral form of 'public assistance'—like the G.I. Bill—that satisfies the standard the Supreme Court articulated in the well-known footnote 38 of its *Nyquist* decision." Def. State Motion at 14. For the reasons discussed below, the Defendants' position is not well-taken.[16]

■ The Supreme Court has generally grounded its decisions upholding programs which provide some type of aid to educational institutions against Establishment Clause challenges on two related principles. The first, that programs which are "made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited" do not offend the Establishment Clause, comes directly from *Nyquist's* footnote 38. *See Nyquist,* 413 U.S. at 783 n. 38, 93 S.Ct. at 2970 n. 38. The second, that a program does not violate the Establishment Clause if aid inures to the benefit of a religious institution "only as a result of the independent and private choices of aid recipients," is essentially footnote 38 in application. *Witters,* 474 U.S. at 488, 106 S.Ct. at 752. Both principles, if they are to mean anything, must be applied within the context of the challenged program. The relevant inquiry in any Establishment Clause challenge is whether the choices available under the program at issue are broad enough so as not to influence recipients to choose a religious alternative, not whether the entire universe of options available, both within and outside the program, are sufficient to ensure that a recipient's decision to choose a religious alternative can be considered independent of state influence. In other words, the concern of the Clause is not whether a party has choices beyond those provided by a state aid program, but whether, when one chooses a state program—perhaps over other choices—he can exercise his options

15. Community schools are state-funded, non-religious institutions that are independently operated by self-elected governing boards. Students are admitted to these schools on the basis of lottery. Magnet Schools are "for elementary students focused on the arts, foreign language, computers and science, or other distinctive curricular approach, and may provide Montessori methods and programs emphasizing basic skills." State Defendants' Motion for Summary Judgment at 15–16. Students are accepted into magnet schools by application only; however, assignments are based on lottery when the number of eligible applicants exceeds the number of slots at a particular school. *Id.*

16. Defendants' proposed analysis of the educational choices available to students eligible for the Voucher Program is similar to that applied by the Wisconsin Supreme Court in *Jackson v. Benson,* 218 Wis.2d 835, 578 N.W.2d 602 (1998). In *Jackson,* the court considered the Milwaukee Parental Choice Program ("MPCP"), a program in which the State provided money for up to 15% of the student membership of the Milwaukee Public Schools to attend private sectarian or nonsectarian schools. In analyzing the constitutionality of the MPCP, the court considered the program in the context of "pre-existing educational choices available to MPS children." *Id.* at 614 n. 9. Ultimately, the court concluded that the MPCP is neutral, and is in no way skewed toward religion. *Id.*

Although the *Jackson* court considered the MPCP in the entire context of educational alternatives available to students, its analysis fails to fully explain its reasoning for doing so. Specifically, the court does not indicate why the funds challenged in that case should be considered in conjunction with funds that were not challenged. As will be discussed herein, under existing Supreme Court precedent, this court cannot adopt the analysis employed by the *Jackson* court.

within that program without being steered toward a religious institution.[17]

There are two points at which parents must make decisions with regard to sending a child to a Voucher school. First, they must decide whether to enroll their child in the Program. Second, upon deciding to do so, parents must select a school. The court's analysis must necessarily take into account the alternatives available under the latter choice as opposed to the former because it is the Voucher Program that has been challenged. Conducting this analysis reveals that the alternatives available under the Program are so narrow that a recipient's decision to attend a religious school cannot reasonably be said to have been made "only as a result of [his or her] independent and private choices."

Accepting Defendants' argument that the constitutionality of the Voucher Program should be analyzed at the point at which parents first decide whether to enroll their children in the Voucher Program as against all other available options would stand Establishment Clause jurisprudence on its head. In almost any program that could come under attack under the Clause, there are likely a myriad of alternatives a recipient must choose from before ever deciding whether to take advantage of the program's benefits. If courts were to take into account such alternatives, which in many instances would arguably not be comparable to those offered under the challenged program, it would be a rare case in which a program providing aid to a

religious institution would even come close to violating the Establishment Clause.

A review of the relevant cases reveals that the Supreme Court has always assessed the question of "choice" within the context of the challenged program and that the Court has never gone so far as to undertake an analysis like the one Defendants argue this court should adopt.[18] In *Witters*, for example, the Court looked to the options available to blind students to utilize monies available to them under the State of Washington's vocational rehabilitation assistance program. It found that there were sufficient options regarding the institutions at which the assistance might be utilized such that the Court could conclude that "[a]ny aid provided under Washington's program that ultimately flows to religious institutions does so only as a result of the genuinely independent private choices of aid recipients." *Id.* at 488, 106 S.Ct. at 752. In reaching its decision, the Court did not concern itself with the full range of possible options that a blind student might have apart from funds received from the program to achieve his or her educational and vocational goals. The Court in no way suggests that it would be appropriate to look at these other options in an effort to determine whether any money which flows to a religious institution under a challenged program is a result of the genuine private choice of the individual.

---

17. To the extent that Defendants argue that the Tutorial Program should be considered an educational option, based upon the reasons articulated in this section, such argument is not well-taken.

18. The Defendants argue that *Mueller* supports their position because the Court there took into account the fact that the tax deduction at issue was one of many provided under the Minnesota tax laws. This argument disregards the fact that a significant basis for the Court's opinion was that, unlike the Voucher Program, the tax deduction benefitted children attending public schools; private, nonsectarian schools and private sectarian schools alike. In other words, the "choice"

question in *Mueller* was, in fact, whether the challenged program applied to all students equally.

Moreover, a reading of the Court's opinion reveals that it considered the tax deduction at issue as part of the State's entire tax scheme because "[l]egislatures have broad latitude in creating classifications and distinctions in tax statutes...[and therefore,] the Minnesota legislature's judgment that a deduction for educational expenses fairly equalizes the tax burden of its citizens and encourages desirable expenditures for educational purposes [was] entitled to substantial deference." *Mueller*, 463 U.S. at 396, 103 S.Ct. at 3068 (citations omitted).

Defendants seek to distinguish this case from *Nyquist* by arguing, in essence, that the state of the art in education did not include magnet schools and community schools at the time of that decision. Whether or not that proposition is true as a matter of fact, there is nothing in the Court's opinion to suggest that it would have considered such information had it been available. The concern of the Court was with the fact that one wishing to utilize tuition grants under the program had very few nonreligious as compared to religious options. Thus, as under the Voucher Program, there was an incentive for persons to utilize state funds under the program to attend religious institutions. Like the instant case, one could not say that the choices made by parents under the *Nyquist* program were the result of the genuine private choices of participating individuals.

The "choices" available to a Voucher student are more analogous to those offered in *Nyquist* than those in cases like *Witters, Mueller* and *Zobrest*. In *Witters*, the student applying for vocational rehabilitation assistance under the Washington statute could take the assistance he had been awarded and put it to use at any college within the State of Washington. In *Mueller*, parents of children attending any elementary or secondary school in the State of Minnesota, whether public or private, sectarian or nonsectarian, could take advantage of the tax deduction for school expenses. In *Zobrest*, the deaf student who required an interpreter under the IDEA could utilize the skills of his interpreter at any high school in the United States. In stark contrast to *Witters, Mueller* and *Zobrest*, a student who receives a voucher under the Program may apply the voucher *only* at one of the schools participating in the Voucher Program. Because a Voucher student must apply his or her voucher at one of only fifty-six participating schools, over 82% of which are sectarian, a Voucher student has no meaningful choice at all. Unlike the funds in *Witters, Mueller* and *Zobrest*, funds under the Voucher Program flow to religious institutions, not as a result of the "genuinely independent private choices of aid recipients," but rather as a result of the very nature of the Program.

## VII. CONCLUSION

The separation of church and state was of prime importance to some of the most influential founders and framers of the United States Constitution. Yet it has long been recognized that it is probably not possible or desirable to erect a complete wall between the two. "[A] scrupulous neutrality by the state, as among religions and also as between religious and other activities ... is what is required." *Roemer, III v. Board of Pub. Works of Maryland,* 426 U.S. 736, 745–46, 96 S.Ct. 2337, 2344, 49 L.Ed.2d 179 (1976). As a result, some types of governmental aid to religious institutions do not implicate the concerns which underlie the Establishment Clause or run afoul of its requirements, while other types do. Remote, incidental or indirect aid that flows to religious educational institutions does not violate the Clause. On the other hand, aid which is provided to directly support the educational program of such an institution, especially religious instruction and indoctrination, is normally prohibited.

The Supreme Court has carved out an exception to this general rule. Where a program is found to have a permissible secular purpose and does not foster an excessive entanglement between church and state, it will be upheld against an Establishment Clause challenge as long as two principles are satisfied. First, a program must not result in government-sponsored religious indoctrination. Where aid is provided under a neutral program and only flows to religious schools as a result of the genuine and independent choices of beneficiaries, a challenged program will not be found to result in government inculcation of religious beliefs. Second, program criteria must not create incentives for students to attend religious schools.

The Voucher Program has a valid secular purpose and there has been no challenge that it creates an excessive entanglement between church and state. Accordingly, the question in this case is whether the Program has the impermissible effect of advancing religion by resulting in government indoctrination of religious beliefs or creating an incentive to attend religious schools. After thoroughly reviewing the submissions of the parties, the court concludes that there are no genuine issues of material fact and that the Voucher Program violates the Establishment Clause as a matter of law because it violates both of these principles.

In all pertinent respects, the Voucher Program is factually indistinguishable from the tuition reimbursement program struck down in *Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). Like *Nyquist*, only private schools receive any funds under the Program. As in *Nyquist* the vast majority of schools participating in the Voucher Program are sectarian. Of the fifty-six schools ·which are authorized participants, forty-six, or over 82%, are religiously-affiliated. Moreover, similar to *Nyquist*, the tuition grants provided under the Program are unrestricted. There has been no attempt to guarantee that state aid only supports secular, as opposed to religious, educational functions of participating schools. Indeed, some recent Supreme Court cases have suggested that even programs in which money does not directly flow to the coffers of a religious institution can still violate the Establishment Clause if aid is provided in such a way as to free up institution funds that would otherwise have been expended on essential, religious or nonreligious, functions.

The court is not persuaded by Defendants' arguments that post-*Nyquist* cases suggest there are meaningful distinctions between this case and *Nyquist*. It is significant that every case cited by Defendants in which the Supreme Court sustained programs providing aid to religious educational institutions against Establishment Clause challenges explicitly discusses and distinguishes itself from *Nyquist*. Each of these cases dealt with programs in which aid was "made available generally without regard to the sectarian, nonsectarian or public, nonpublic nature of the institutions benefited," a type of program the *Nyquist* Court expressly acknowledged it did not have before it. *See id.* at 782–783 .n. 38, 93 S.Ct. at 2970 n. 38. Moreover, under every program, religious schools were merely incidental or indirect beneficiaries because aid benefitted them "only as a result of the genuinely independent and private choices of aid recipients." *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). *See also Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983). Additionally, none of the programs at issue in post-*Nyquist* cases incorporated eligibility criteria which impermissibly created incentives to attend religious institutions. None of them allocated aid on the basis of criteria that either favored or disfavored religion.

This case is unlike any case in which the Supreme Court has upheld programs providing aid to religious educational institutions. Because the vast majority of schools participating in the Voucher Program are sectarian in nature, the Program does not make aid available without regard to the nature of the institutions benefitted. Likewise, recipients do not have available to them the kind of "choice" contemplated by post-*Nyquist* cases. By the very nature of the Program, parents do not have a genuine choice between sending their children to sectarian or nonsectarian schools because sectarian schools overwhelmingly predominate. Unlike cases decided after *Nyquist*, the aid provided under the Voucher Program directly benefits the religious functions of participating sectarian institutions because it cannot be said that aid only flows to religious institutions as a result of the independent and private choices of recipients. Thus, the Program has the effect of advancing religion

through government-supported religious indoctrination.

The Voucher Program is also unlike post-*Nyquist* cases in that program criteria create incentives for students to attend religious schools. Voucher students may only redeem their vouchers at schools which have registered and are authorized to participate in the Program, not at any school of their choice. Because the vast majority of participating schools are sectarian in nature, the Program directly influences whether a recipient chooses to attend a religious institution.

It is important to note that this court does not rest any portion of its decision on an inquiry into, or a determination of, the number of students actually attending religious institutions under the Voucher Program. While it is impermissible to determine the constitutionality of a genuinely neutral program on a year-to-year assessment of the extent to which beneficiaries pursue religious versus nonreligious options, it is incumbent on a court to determine whether a challenged program contains genuine nonreligious options. Undertaking this determination, this court concludes that the Voucher Program is not neutral. Because of the overwhelmingly large number of religious versus nonreligious schools participating in the Voucher Program, beneficiaries cannot make a genuine, independent choice of what school to attend. A program that is so skewed toward religion necessarily results in indoctrination attributable to the government and provides financial incentives to attend religious schools. For both of these reasons, the court finds the Program to be in violation of the Establishment Clause.

Accordingly, the court grants the Motions for Summary Judgment of Plaintiffs Doris Simmons–Harris, *et al.* and Plaintiffs Sue Gatton, *et al.* (Doc. Nos. 83 and 97, respectively), and hereby denies the Motions for Summary Judgment of Intervening Defendants Senel Taylor, *et al.* and the State Defendants, *et al.* (Doc. Nos. 82 and 92, respectively). The State Defendants are permanently enjoined from administering the Voucher Program.

Because counsel for all Plaintiffs have consented to a stay of this court's Order pending Sixth Circuit review, this court hereby stays said Order in its entirety pending such review. *See* Order of December 8, 1999 (Doc. No. 127).

IT IS SO ORDERED.